No. 86-273

IN THE SUPREME COURT OF THE STATE OF MONTANA

1987

---

CITY OF GREAT FALLS, MONTANA,
a municipal corporation,

        Plaintiff and Respondent,

  -vs-

M.K. ENTERPRISES, INC., a corporation,
TIM WOLF and ROBERT WOLF, individuals,
d/b/a RED DOOR ADULT BOOK STORE, et al.,

        Defendants and Appellants.

---

APPEAL FROM: District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable Thomas McKittrick, Judge presiding.

COUNSEL OF RECORD:

    For Appellants:

        Goldman & Goldman; Bernard J. Goldman argued, Missoula,
Montana (M.K. Enterprises & Treasure State Sales)
Datsopoulos, MacDonald & Lind; Edward A. Murphy argued,
Missoula, Montana (Wolf d/b/a Red Door Adult Book
Store)

    For Respondents:

        David Gliko argued, City Attorney, Great Falls,
Montana

---

Submitted: December 9, 1986

Decided: February 5, 1987

Filed: FEB 5 - 1987

_Ethel M. Harrison_
Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

This is an appeal from an Eighth Judicial District, Cascade County decision upholding the constitutionality of a Great Falls city ordinance. The ordinance establishes a $300 per booth annual license fee on video booths used to view adult movies. We affirm.

The issue is whether the trial court erred in concluding that the $300 annual fee for adult movie video booths was reasonable as a regulatory measure and therefore not a violation of the First Amendment of the United States Constitution.

In January 1983 the City Commission of Great Falls adopted Ordinance No. 2311 "providing for the establishment of license fees to be paid by operators of coin-operated devices depicting sexual activities." The annual license fee imposed under this ordinance is $300 per booth. At the time of the trial of this case, there were a total of 59 booths in four adult bookstores in the City of Great Falls.

The booths are small cubicles in which customers view movies on a television or movie screen. To view the movie, the customer is required to deposit money in a coin box. It has not been argued that any movies shown were obscene or otherwise illegal, but they are admittedly sexually explicit.

This case began when the City of Great Falls (City) filed actions against two owners of adult bookstores for failing to pay the annual license fee. The actions were consolidated, together with another case filed by a third adult bookstore owner who was challenging the constitutionality of the ordinance. A trial was conducted at which the City presented evidence of actual and anticipated costs justifying the fee. After considering the evidence before it, the District Court concluded that the City had met its

burden of proving that the $300 fee is reasonable and "designed to further valid, nonspeech-related municipal interests." On appeal, the bookstores argue that the City has failed to prove that the $300 fee is justified by the costs established, or that it is either nominal or imposed to defray the expenses of policing the booths.

Did the trial court err in concluding that the $300 annual fee for adult movie video booths was reasonable as a regulatory measure and therefore not a violation of the First Amendment of the United States Constitution?

The First Amendment to the Federal Constitution provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press." This right of free speech is protected from state infringement through application of the Due Process Clause of the Fourteenth Amendment. Grosjean v. American Press Co. (1936), 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660. Although many persons find them distasteful, booths for viewing adult oriented films which are not obscene or otherwise illegal are protected by the First Amendment. A license fee on such protected activities will pass constitutional muster only if the fee is nominal and imposed as a regulatory measure to defray the expenses of policing the activity in question. Murdock v. Pennsylvania (1943), 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292. These expenses may include more than routine processing of licenses; among permissible costs is the cost of "protecting those on the streets and at home against the abuses of solicitors." Murdock, 319 U.S. at 116, citing Cox v. New Hampshire (1941), 312 U.S. 569.

The District Court cited cases involving fees on adult video booths and expanding the statement in Murdock that the allowable license fee may include the costs of policing the

activity being licensed. In Bayside Enterprises, Inc. v. Carson (D.C.Fla. 1979), 470 F.Supp. 1140, 1149, the court stated:

> As it now stands, the Code will merely serve perfectly valid municipal interests in public safety and welfare, most notably the presence of safe and sanitary conditions and the prevention of criminal conduct. These interests are wholly unrelated to suppressing free speech and, significantly enough, the plaintiffs have presented no evidence that furthering these interests through the Code's fee system would have the effect of suppressing free speech. Put another way, there is no evidence before this Court that these fees will drive the plaintiffs out of business or in any way hamper their ability to communicate through purveying their books and films. In sum, the City has met its burden of proving that these fees are reasonable, and that they are designed to further valid, nonspeech-related municipal interests. Accordingly, they must be held constitutional.

The District Court also relied upon a North Dakota case in which a $300 per booth license fee for adult video booths was upheld. In City of Minot v. Central Ave. News, Inc. (N.D. 1981), 308 N.W.2d 851, 860, the court stated:

> . . . Central does not point to, nor has our own research unearthed, authority to the effect that a city must, before implementing a licensing scheme with a fee, demonstrate what the administrative costs would have been in the past had the licensing scheme been in effect. Moreover, we believe that Central's reliance upon Bayside Enterprises, Inc. v. Carson, 450 F.Supp. 696 (M.D.Fla. 1978), to support its contention is misplaced. In Bayside, the licensing fee in question was struck down not because it was speculative, but because the City of Jacksonville's projected costs of enforcing a newly enacted licensing ordinance for adult bookstores were unreasonable. Thus, regarding the licensing fee at issue in the instant case, we are left to determine only its reasonableness.

4

Based on evidence of anticipated costs of routine policing of the video booths, together with anticipated costs of proceeding on violations of the law, the court upheld the $300 per booth annual fee.

In the present case, the District Court's findings and conclusions outline the testimony given at the hearing as to costs of regulating and policing the booths. The evidence established past police department costs of $44 per year for routine investigation to verify licensing requirements; $1,408 in expenses incurred in 1982-83 for a stakeout related to an outbreak of venereal disease traced to one of the booths; and $220 in expenses for a child pornography check. An experienced detective testified on estimated future police department costs and expenses relating to adequate policing of the booths. He estimated that it would cost $1,786.88 per year to police the booths to insure adequate enforcement of the State child pornography law, § 45-5-625, MCA; $8,064 per year to police the booths to insure adequate enforcement of the State deviate sexual conduct law, § 45-5-505, MCA; and $2,688 per year to police the booths to insure adequate enforcement of the State obscenity law, § 45-8-201, MCA. The officer testified that at the time of the hearing the deviate sexual conduct law and the obscenity law were not being enforced in the City of Great Falls. A second law enforcement officer testified on the need for enforcement of the laws prohibiting minors in these establishments.

The District Court also heard testimony that City-County health enforcement costs and expenses for the booths in 1982-83 were $2,155.19, relating to the venereal disease traced to a video booth. There was uncontroverted testimony of homosexual and heterosexual intimate conduct between persons either sharing a booth or using "glory holes" in the walls between the booths. Yearly health enforcement costs

5

were set at $551.65, plus an anticipated increase in costs of monitoring and follow up contact tracing resulting from sexual contact in the booths and the risk of sexually transferable communicable diseases. Administrative licensing expenses were established as $18.29 for the cost of issuing the original license for each establishment and estimated annual renewal expense of $29.44 for each establishment.

This Court has indicated that estimates of future expenses may be included for purposes of setting a license fee. State v. Police Court (1923), 68 Mont. 435, 443-44, 219 P. 810, 812. Until law enforcement efforts have been in effect for a substantial period of time, we recognize that the costs of enforcement cannot precisely be established. The cost estimates provided by the City total over $13,000 per year, plus the anticipated increased health department costs. As stated previously, health department costs were over $2,000 in 1982-83 from one outbreak of venereal disease. At $300 per booth, the city will receive income of $17,700 per year on 59 booths. We conclude that the lower court was correct in not requiring proof of expenses precisely equalling the amount which will be collected on 59 video booths.

The bookstores also argue that it was not proven that enforcement of the child pornography law was in any way connected with operation of the video booths. The need for enforcement of the child pornography law is not eliminated because no child pornography has been found in the booths in the past. That conclusion would ignore the very nature and purpose of the booths - to show sexually titilating films for all manner and persuasion of customers.

The City has proposed random checks by plainclothes officers to enforce the deviate sexual conduct statute. Our conclusion that this proposal is reasonable is not changed by the bookstores' proposal of alternative methods, which they

say infringe less on the right of free speech. Without going into detail, we conclude that the enforcement methods proposed by the bookstores would not be effective.

There was no evidence that the $300 per booth fee will drive the bookstores out of business or prohibit them from communicating through the films. Although the bookstores have questioned some of the enforcement cost figures, we affirm the holding of the lower court that the City has submitted sufficient evidence to justify the $300 per booth fee. We affirm the conclusion of the District Court that the City has met its burden of proving that the fee imposed is justified by the costs established and is set at an amount designed to defray the expenses of policing the booths.

Affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____

Justices

Mr. Justice John C. Sheehy, dissenting:


It is not an easy or pleasant task to defend the purveyors of sexually-explicit films from a confiscatory tax in the guise of a license fee. Yet, the constitutional protection of the First Amendment is like the air we breathe, it is there for the good and the bad. For the same reasons that I would strike down a law that levied a $2,000 annual license fee on individual lawyers (proposed in the 50th Legislature) I must urge striking down the exorbitant license fee in this case. License fees are levied under the police power of the state and their assessment cannot go beyond the cost of policing the activity licensed, otherwise exorbitant fees violate the principle of uniform taxation, and are held to be confiscatory. If the First Amendment is involved, there is additionally a problem of prior constraint. Once permitted, exorbitant license fees will be enacted on the wildest speculation and spread to other, perhaps cleaner endeavors. As the Spanish proverb said, "When you see your neighbor being shaved, prepare yourself for the barber."

The claimed costs by the city in justifying the license fee are exaggerated or illusory. For example, of the 455 venereal disease cases in Cascade County in 1982, two were traced to contacts at an adult bookstore. No further incidence of venereal disease traceable to adult bookstores or adult film booths have occurred in that county to the time of trial here. Yet the majority allow $1,400.00 per year in expenses for a stakeout, and $2,155.19 in annual city and county health costs as if these were annual recurring costs.

The detectives in this case have acknowledged that they found no instances of child pornography in the time that these booths have existed in Great Falls. It is a crime in

8

Montana, § 45-5-625, MCA, to use a child for or to expose him to pornographic material anywhere in the State. At the present time the City of Great Falls has no program for enforcement of this act. If the statute were to be enforced by the City of Great Falls, the cost of enforcement should be an obligation of the general taxpayers.

Likewise it is a crime under § 45-8-201, MCA, purposely or knowingly to provide, sell or deliver obscene material to anyone under age 18. This statute applies everywhere in the State of Montana. The City of Great Falls has no present program for the enforcement of the obscenity statute. Again the enforcement, if and when it occurs in the City of Great Falls should be an obligation of the general taxpayers.

It is likewise a crime in the State of Montana to engage in deviate sexual conduct under § 45-5-505, MCA. No instance of a prosecution for such conduct related to the booths appears in the evidence of this case. If there is a program for enforcement of this statute in the City of Great Falls, again it should be the obligation of the general taxpayers.

In Wendling v. City of Duluth (D.C. Minn. 1980), 495 F.Supp 1380, 1384, 1385, the Court said:

> The narrow question here is whether the imposition of a license fee to finance enforcement of a separate obscenity ordinance can be considered the permissible policing of activities as prescribed in the Murdock case, or whether Murdock requires that the fee be no greater than is necessary to administer and enforce the licensing ordinance itself. A review of the case law suggests that the latter is the correct view.

The majority rely upon Bayside Enterprises, Inc. v. Carson (D.C. Fla. 1979), 470 F.Supp. 1140. In that case, the Court upheld a $35 license fee. It was a follow-up case from an earlier one, Bayside Enterprises, Inc. v. Carson (M.D. Fla. 1978), 450 F.Supp. 696, that struck down a $100 fee on

9

the grounds that the fee was speculative because the projected costs of enforcing a licensing ordinance for adult bookstores was unreasonable.

I would strike down the $300 fee as unreasonable, and because of its unreasonableness, a prior constraint on the First Amendment rights of the licensees.

_____
Justice


Mr. Justice William E. Hunt, Sr.:

I concur in the dissent of Mr. Justice Sheehy.


_____
Justice

10